UNITED STATES OF AMERICA,

      Plaintiff,

                                   Case No. 15-cr-108-pp

  v.

DERON GILBERT,

      Defendant.

---

**ORDER DENYING LETTER MOTION TO APPOINT COUNSEL FOR COMPASSIONATE RELEASE MOTION (DKT. NO. 607) AND DENYING PETITIONER'S MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. §3582(C)(1)(A)(i) (DKT. NO. 608)**

---

On January 27, 2016, the defendant signed a plea agreement admitting that between 2012 and June 2, 2015, he conspired with others to possess with intent to distribute and to distribute cocaine and crack. Dkt. No. 220. The court accepted his guilty plea on March 24, 2016. Dkt. No. 257. On December 15, 2017, the court sentenced the defendant to serve seventy-two months in custody, followed by five years of supervised release. Dkt. No. 516.

On November 5, 2020, the court received from the defendant a letter asking the court to appoint him a lawyer to assist him in his efforts to obtain compassionate release. Dkt. No. 607. The defendant indicated that he couldn't type the motion because of a COVID-19-related lockdown at FCI Sandstone (the facility where he is incarcerated). Id.

The same day—November 5, 2020—the court received from the defendant his motion for compassionate release. Dkt. No. 608. He explained

1

that he is incarcerated at FCI Sandstone, which had suffered an outbreak of COVID-19, and that he had tested positive for the virus on September 18, 2020. Id. at 1. The petitioner noted that he had asked the BOP to release him to home confinement, but that on July 29, 2019 the warden of Sandstone had denied that request. Id. at 1-2. He indicated that he had asked for reconsideration, but that the warden had not acted on that request within thirty days. Id. at 2.

In support of his motion for compassionate release, the petitioner indicates that he is a Black male, that he is obese, with a BMI of 33.4, and that he has chronic asthma "as diagnosed by Froedert Hospital located in Milwaukee, Wisconsin." Id. at 4. He indicates that a member of the medical staff at his facility, R.N. K. Lubbehussen, advised him that although he had contracted COVID-19 once, he could possibly contract it again after ninety days. Id. at 2, 4. The defendant also indicates that in April 2014, the mother of his two daughters (then ages three and nine) was killed by a stray bullet, and that the defendant had been raising the girls until his incarceration in March 2018. Id. at 3. Once he went into custody, his mother took over caring for the children. Id. at 3-4. The defendant says that his mother has undergone several surgeries and that his mother's doctors have told her she can no longer care for the children, and he says that there is no other family member who can do so. Id. at 4.

The court asked Federal Defender Services to review the motion to determine whether it might file something on the defendant's behalf. Dkt. No.

609. After reviewing the defendant's records and asking for some time to conduct additional research, dkt. no. 611—a request the court granted, dkt. no. 612—Federal Defender Services responded that due to the demands on its time, it could not file anything for the defendant, but emphasized that it was not taking a position on whether the court should grant the defendant's motion, dkt. no. 613.

The court also asked probation and the government to weigh in on the defendant's motion. Probation reported that the Bureau of Prisons was reviewing cases for potential early release to home confinement, giving priority to inmates with COVID-specific risk factors. Dkt. No. 615 at 2. It advised the court that BOP medical records showed that the defendant is obese and that he had tested positive for COVID-19 in September. Id. at 1. The records also showed that the defendant "may have a hernia, and show a history of asthma," but that he didn't appear to be prescribed any medication. Id. Probation confirmed that the defendant applied for compassionate release through the BOP but was denied in July 2020. Id. at 2. Probation indicated that the defendant has had two disciplinary violations between 2018 and 2019, resulting in a loss of ninety-five days of good time. Id. BOP records also confirmed that the defendant has taken programming—prosperity mindset, personal development, blueprint welding, staying alive, money smart, job fair interview, job fair information, chess, high school basketball referee and aerobic wellness. Id. The BOP shows the defendant's home detention eligibility date as January 9, 2023 and his release date as July 9, 2023. Id.

The government opposes release. Dkt. No. 616. It argues that asthma—
especially when the defendant has not explained whether his asthma is mild,
moderate or severe—is not an extraordinary and compelling reason to grant
release. Id. at 7. As for obesity, the government argues that BMI alone, while a
factor that may put an individual at higher risk of severe illness if infected with
COVID-19, does not provide much insight into a person's overall medical
condition. Id. at 8. It points to BOP medical records indicating that the
defendant already has been infected with COVID-19 but was asymptomatic;
the fact that he was obese and claims to suffer from asthma did not result in
his becoming severely ill. Id.

As for the defendant's family circumstances, the government points to
the letter the defendant provided from his mother's doctor, which states that
the defendant's mother "may not" be able to care for his daughters (now nine
and fifteen) "as she normally would." Id. at 9. The government notes that the
letter from the doctor's office is dated in July 2020—four months before the
government filed its response—and that the defendant provides no information
about what happened with his mother's condition between July and November
2020; the government argues that the letter "raises more questions than it
answers." Id.

Finally, the government reminds the court that the defendant pled guilty
to a very serious offense—"[h]e was a member of the Atkinson street gang and a
large scale supplier for street gangs operating in the areas surrounding
Atkinson and Hampton Avenues of the City of Milwaukee." Id. at 10. The

4

defendant was responsible for distributing, and possessing with intent to distribute, over fifteen kilograms of cocaine, traveling out of the state to obtain cocaine and sending co-conspirators to do the same. Id. He possessed guns to protect the drug enterprise. Id. at 11. The BOP characterizes him as a medium risk to reoffend. Id. The government also notes that the court imposed a sentence less than half the low end of the applicable guideline range, and that the defendant now asks the court to release him after serving less than half of *that* sentence. Id. at 1.

The defendant filed a reply brief. Dkt. No. 638. In it, he adds that he is vulnerable to severe illness if infected with the virus because he has had previous surgeries for "kidney issues" and a minor surgery for hernia repair. Id. at 3. He again asserts that his mother cannot care for his children. Id. He asserts that the facts that the court allowed him to remain free on bond pending his plea and sentencing, and that he was allowed to self-surrender, show that he does not present a danger to the community. Id. at 9. The defendant also filed a letter from his mother, describing her difficulties in caring for her grandchildren—she sometimes misses a dose or two of her medication. Dkt. No. 639 at 1. He attached a December 28, 2020 letter from someone at his mother's doctor's office, reiterating that the defendant's mother "feels she can't care for young children" and that she is "unable to care for others as she normally would." Id. at 639. The defendant has provided the court with numerous letters of support from friends and family members, even from people the defendant coached in football before he was incarcerated.

Finally, on January 21, 2021, the court received from the plaintiff a long letter explaining how much he had learned since being incarcerated, how much he regrets his actions and the impact they have had on his family (especially his daughters) and his aspirations for living a different life when he is released. Dkt. No. 640.

The court will deny the defendant's motion to appoint counsel to represent him. The court has more than enough information to conclude that there is not a basis for granting the defendant compassionate release.

The law says that generally, a court may not modify a term of imprisonment once it has been imposed. 18 U.S.C. §3852(c). The compassionate release provision of the First Step Act makes an exception to that rule in certain narrow circumstances. It says:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(b);

6

And that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; . . . .

The first part of that statute—section (c)(1)(A)—says that the Director of the BOP may make a motion to the court, asking for a compassionate release sentence reduction. The BOP has not done that here.

In the alternative, the statute says that the *defendant* may make a motion to the court after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." The defendant provided the letter from the warden denying his request for a reduction in sentence[1], dkt. no. 608-1 at 6, as well as his August 8, 2020 letter request for reconsideration, dkt. no. 608-1 at 8-9. Probation confirms, and the government agrees, that the defendant did ask the warden for a compassionate release reduction and that the warden denied that request. See Dkt. No. 124-1. The court concludes that the defendant has exhausted his administrative remedies as the statute requires and will move on to the merits of his motion.

Section 3852(c)(1)(A)(ii) doesn't apply to the defendant; he is not at least seventy years old (he is thirty-nine), has not served at least ten years of his sentence and the BOP has not determined that he is not a danger to the community. So the only basis for the court to grant the defendant's motion

---

[1] It appears that the defendant sought a sentence reduction from the warden of Sandstone solely based on his claim that his mother could not care for his children, and not on the basis of his own health condition. Dkt. No. 608-1 at 6, 8-9.

7

would be §3582(c)(1)(A)(i)—if there were "extraordinary and compelling reasons" that warranted a sentence reduction. The application note to U.S.S.G. §1B1.13 defines "extraordinary and compelling" reasons:

(A) **Medical Condition of the Defendant.**—

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples included metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

That substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover.

(B) **Age of the Defendant.**—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75% of his or her term of imprisonment, whichever is less.

(C) **Family Circumstances.**—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) **Other Reasons.**—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an

8

extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

The defendant does not fall into category (A)—he does not suffer from a terminal illness or from any debilitating illness or condition that would make him unable to care for himself and from which he is not expected to recover. The defendant does not fall into category (B)—he is not at least sixty-five years old and is not experiencing physiological deterioration due to the aging process.

The defendant argues that he falls into category (C)—he alleges that the caregiver of his minor children, his mother, is no longer able to care for them. But the evidence the defendant has presented does not support that argument. The defendant's daughters are now nine and fifteen—while they are not old enough to live on their own, they no longer are "small children." The defendant's mother wrote to the court, and while she urges the court to release her son, she does *not* indicate that she cannot care for her grandchildren. She says it is difficult, and the court has no doubt that it is. But she does not say she is incapacitated. Even the letters from the defendant's mother's health care provider do not say that she is incapacitated or that she cannot care for her grandchildren. The letters say that she feels that she cannot care for them as she would like, or that she may not be able to care for them as she normally would. Category (C) applies to defendants who have no one to take care of their minor children. While the court understands that it is a burden to the defendant's mother to care for his daughters when she likely should be spending most of her energy taking care of herself, the defendant is not in a situation where he has no one to care for his adolescent and teen daughters.

9

So the court must analyze the defendant's request under category (D) and determine whether there are some other extraordinary or compelling circumstances in this defendant's particular case that warrant the compassionate release reduction.

The defendant indicates that he has asthma. In a bond study prepared in June 2015 in connection with the defendant's detention hearing, the defendant made no mention of having asthma, indicating that he was not on medication or under a doctor's care. Dkt. No. 22 at 3. In the November 2016 presentence investigation report, the defendant did not mention asthma, telling the presentence writer that he had no history of chronic illnesses or medical conditions. Dkt. No. 335 at ¶85. As for kidney issues, the presentence report says nothing about surgeries for kidney issues. It *does* say that twice the defendant was treated at Froedtert Hospital for kidney stones, but says nothing about surgery or any other kidney conditions. Id. at ¶84. The BOP records indicate that in December 2019, the defendant self-reported childhood onset asthma, reporting that he had not used an inhaler "for about 3 years now." Dkt. No. 618 at 24.

The Centers for Disease Control and Prevention indicate that "[p]eople with moderate to severe asthma *might* be at higher risk of getting very sick from COVID-19." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. The American Academy of Allergy,

Asthma and Immunology indicates that "currently there is no evidence of increased infection rates in those with asthma," and that "there are no published data" to support the CDC's determination that people with moderate to severe asthma could be at greater risk for more severe disease. https://www.aaaai.org/conditions-and-treatments/library/asthma-library/covid-asthma.

Even if there were data showing that people with moderate to severe asthma were more likely to become severely ill if infected with COVID-19 than those who do not have moderate to severe asthma, the defendant has not described his asthma as either moderate or severe. He did not mention it in the 2015 bond study or the 2016 presentence investigation report and he told prison medical staff in 2019 that he had not used an inhaler for three years. With little to no medical evidence that the simple fact of having asthma makes a person more vulnerable to infection or more vulnerable to severe illness if infected, the fact that the defendant has asthma is not an extraordinary and compelling reason for release.

The defendant says that he has a body mass index of 33. The CDC defines someone with a BMI of over 30 as obese and says adults who are obese are at an increased risk of severe illness from the virus that causes COVID-19. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#obesity. This appears to be because "[p]eople with obesity are more likely that normal-weight people to have other diseases that are independent risk factors for severe COVID-19, including heart disease,

11

lung disease, and diabetes. They are also prone to metabolic syndrome, in which blood sugar levels, fat levels, or both are unhealthy and blood pressure may be high." https://www.sciencemag.org/news/2020/09/why-covid-19-more-deadly-people-obesity-even-if-theyre-young. The defendant's medical records do not indicate that he has other independent risk factors, such as heart or lung disease, diabetes or high blood pressure. And as the government notes, the defendant has been infected with COVID-19, and the fact of his obesity did not result in severe illness (or any illness at all).

The defendant notes that he tested positive for COVID, and the BOP records show that on September 17, 2020, the defendant tested positive for COVID-19. Dkt. No. 618 at 1. It appears that though the defendant was isolated for ten days, he did not develop symptoms. Id. at 8-9. The defendant says that someone on the Sandstone medical staff told him that he was likely to get it again in ninety days. The court suspects the defendant may have misinterpreted what he heard (or may have received misinformation). The Centers for Disease Control state that they are aware that there are some reports of people who have become re-infected, but indicate that there is "no widely accepted definition of what constitutes SARS-CoV-2 reinfection . . . ." https://www.cdc.gov/coronavirus/2019-ncov/php/invest-criteria.html. The CDC say that "[s]ince August 2020, CDC has recommended *against* the need for retesting persons with asymptomatic infection within 90 days of first SARS-CoV-2 infection or illness because evidence *to date* suggests that reinfection does not occur within this time window." Id. The CDC suggest that

asymptomatic people be tested ninety days or more after they were first infected. Id. But studies have shown that "repeat infections are rare;" in a study of about 6,600 United Kingdom healthcare workers who already had been ill with COVID-19, fewer than 1% got infected again. https://www.nature. com/articles/d41586-021-00071-6. The court suspects that the medical staff member may have been telling the defendant, not that he was likely to be get infected again after ninety days, but that might need to be *tested* again after ninety days. The defendant's concern that he could become re-infected is not an extraordinary or compelling reason for release.

As of January 25, 2021, FCI Sandstone reported zero COVID-positive inmates and five COVID-positive staff, with 713 recovered inmates, forty-seven recovered staff and one inmate death. https://www.bop.gov/coronavirus (under "Full breakdown and additional details . . ."). This indicates that while Sandstone had a significant outbreak at one time, the facility has the virus situation under control for the moment. That may change. But the court also notes that there are now vaccines for this virus, two of which are starting to be administered. While there is no guarantee there will not be another outbreak at Sandstone, it appears the defendant would be less likely to contract it after having had it once and over the next several months, there is hope that he and his fellow inmates may be vaccinated.

Even if the defendant could show that his health or his family situation constituted extraordinary and compelling reasons for the court to drastically reduce his sentence, the court still would have to consider the factors under 18

U.S.C. §3553(a)—the nature and circumstances of the offense and the history and characteristics of the defendant; the need for punishment, deterrence and protection of the public; and the need to avoid unwarranted sentencing disparities. At least thirteen informants described the defendant as a large-scale supplier of cocaine for the Atkinson (ATK) and Hampton (HPT) street crews. Dkt. No. 220 at 18. Some indicated that he was obtaining kilogram quantities of cocaine from a source in Rockford, Illinois and using couriers to assist in bringing the drugs to Milwaukee. Id. at 18-19. The government conservatively estimated that the defendant was responsible for the distribution of at least fifteen kilograms of cocaine. Id. at 20. One of the informants captured a photo of two guns in the defendant's apartment. Dkt. No. 335 at ¶20. A law enforcement search of that apartment revealed a .22-caliber Derringer pistol in the kitchen. Id. at ¶22. The defendant's drug-dealing activities involved several loosely-affiliated smaller groups (who often were conducting their own deals) and went on for several years. There was a need for the sentence the court imposed to punish the defendant for his behavior and for the sentence to deter him from criminal activity in the future.

The defendant's Sentencing Guideline range was 151-188 months—twelve years and seven months to fifteen years and eight months. Dkt. No. 517 at 1. The court sentenced him to only seventy-two months—six years, less than half the low end of the guideline range. His co-defendant Devon Thomas also received seventy-two months, and there was less evidence against Thomas than against the defendant. Another much less culpable defendant, Terrence

Jamison, received thirty-eight months in custody; if the court were to grant the defendant's motion, the defendant would serve less time than a much less culpable co-defendant. For the court to reduce the defendant's sentence further would create an unwarranted disparity, particularly given the lack of risk factors for severe illness if infected.

This is not to say that there are not positive things in the defendant's history since sentencing. He has participated in several programs to try to better his situation. He participated in the Residential Drug Abuse Program (RDAP) and, according to some notes the defendant provided, made progress. Dkt. No. 608-1 at 1. The letters of support the defendant has provided show that he has a strong network of people committed to seeing him succeed when he is released. His own letter to the court shows his comprehension of the fact that he was living a double life, being a good son and father and coach while engaging in the drug trade unbeknownst to those who loved and needed him most.

The court does not mean to trivialize the defendant's concerns about COVID-19. The court has heard from many, many inmates in the last ten months, terrified of contracting the virus. It has heard from inmates worried about their families and friends. It has heard from inmates who report that they cannot practice social distancing, do not have masks, cannot wash their hands frequently, have no access to hand sanitizer. It is much harder for inmates to take the precautions that public health experts advise all of us to

take to avoid the spread of this dangerous virus. The court understands why the defendant seeks compassionate release.

But the defendant, unlike many others, does not suffer from severe underlying health conditions that make him more vulnerable to severe illness if infected. He has been infected and did not become ill. He is in a facility that, for now, has the virus under control. He has someone to take care of his children (even though it is a heavy burden on her). The defendant has not demonstrated the extraordinary and compelling circumstances that would justify the sentence reduction he requests.

The court **DENIES** the defendant's motion to appoint counsel. Dkt. No. 607.

The court **DENIES** the defendant's motion for compassionate release. Dkt. No. 608.

Dated in Milwaukee, Wisconsin this 25th day of January, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

Case 2:15-cr-00108-PP   Filed 01/25/21   Page 16 of 16   Document 641